UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
:
:
: 17cv3762
IN RE: LEHMAN BROTHERS : 17cv3785
HOLDINGS INC. :
: OPINION & ORDER
:
:
:
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM H. PAULEY III, United States District Judge:

      General Ore International Corporation Limited, Neu Holdings U.S. Corporation, Neu Foundation of California, Janice K. Moss, and Amy P. Neu ("Claimants")[1] appeal from the Bankruptcy Court's order granting the SIPA Trustee's Two-Hundred Sixtieth Omnibus Objection to General Creditor Claims ("260th Claim Objection"). Claimants are accountholders of Lehman Brothers Inc. ("LBI"), the brokerage arm of Lehman Brothers Holdings Inc.

      Following LBI's collapse in 2008, James W. Giddens was appointed as the trustee (the "Trustee") tasked with liquidating LBI and returning customer property in accord with the Securities Investor Protection Act ("SIPA"). Although the Trustee expeditiously transferred all customer accounts to a solvent broker, Claimants separately filed general unsecured claims against LBI's estate for damages arising from LBI's failure to transfer their accounts before commencing a liquidation proceeding. The thrust of these claims is that LBI breached its fiduciary duty when it failed to comply with Claimants' instructions to transfer their accounts to new brokerage firms in a timely manner. The Trustee objected to these claims and moved to

---

[1] This Opinion & Order addresses two separate appeals—both styled In re Lehman Brothers Inc.—filed by two groups of Claimants. See Notice of Appeal, No. 17cv3762, ECF No. 1, and Notice of Appeal, No. 17cv3785, ECF No. 1. Both appeals seek identical relief.

disallow them.  The United States Bankruptcy Court for the Southern District of New York

(Chapman, B.J.) (the "Bankruptcy Court") granted the Trustee's motion.  Claimants appeal,

asking this Court to reverse the Bankruptcy Court's order, and remand this action with

instructions to overrule the Trustee's objection.  For the reasons that follow, the Bankruptcy

Court's order is affirmed.

BACKGROUND

This appeal involves the convergence of SIPA, the Bankruptcy Code, the Uniform

Commercial Code ("UCC"), and common law.  It presents the question of whether customers of

a failed brokerage firm may assert general unsecured claims against the firm's estate for damages

arising from unperformed account transfer requests that were submitted prior to the

commencement of a SIPA proceeding.  At stake is more than $117 million in claims that

Claimants seek to recoup based on LBI's alleged failure to transfer their brokerage accounts to

solvent brokers in a timely manner.  (See Appendix to General Ore Int'l Corp., et al. Brief, No.

17cv3762, ECF No. 20–2 ("General Ore Appendix"), at 00009, 00014, 00018, 00021; Appendix

to Neu's Brief, No. 17cv3785, ECF No. 12–1 ("Neu Appendix"), at 0002.)

I. Relevant Facts

In September 2008, with LBI on the brink of an unprecedented collapse,

Claimants scrambled to transfer their securities to other brokerage firms ("New Brokers").  To

that end, Claimants directed their New Brokers to initiate electronic transfer requests to LBI

through the Automated Customer Account Transfer Service ("ACATS") ("Account Transfer

Requests"). ACATS is an electronic transfer service maintained by the National Securities

Clearing Corporation ("NSCC")—a subsidiary of the Depository Trust & Clearinghouse

Corporation ("DTCC")—that facilitates the transfer of customer accounts among DTCC member

2

brokerage firms. At the time of their request, Claimants believed that the New Brokers would liquidate the securities immediately after LBI transferred them.

At some point on or before Thursday, September 18, 2008, LBI acknowledged receipt of the Account Transfer Requests and provided formal notice through ACATS that Claimants' accounts "were slated for transfer and delivery to [the New Brokers]." (General Ore Appendix at 00333.) However, on Friday, September 19, 2008 (the "Filing Date")—with the Account Transfer Requests still pending—the Securities Investor Protection Corporation ("SIPC") obtained the consent of LBI's board of directors to commence a proceeding under SIPA against LBI (the "SIPA Proceeding"). See 15 U.S.C. §§ 78aaa et seq. Later that day, the District Court in the Southern District of New York entered an order commencing liquidation (the "Liquidation Order").

The Trustee was appointed to marshal LBI through its liquidation. The Liquidation Order authorized the Trustee to "operate the business of LBI to: (a) conduct business in the ordinary course until 6:00 p.m. on September 19, 2008, including without limitation, the purchase and sales of securities, commodities futures and option transactions, and obtaining credit and incurring debt in relation thereto; (b) complete settlements of pending transactions, and to take other necessary and appropriate actions to implement the foregoing, in such accounts until 6:00 p.m. on September 23, 2008; and (c) take other action as necessary and appropriate for the orderly transfer of customer accounts and related property." (General Ore Appendix at 00001–00008.)

The SIPA Proceeding was removed to the Bankruptcy Court, which had been presiding over the Chapter 11 bankruptcy of LBI's parent company and its various, non-broker dealer affiliates ("Lehman Chapter 11 Debtors"). See 15 U.S.C. § 78eee(b)(4). In the early

3

hours of Saturday, September 20, 2008, the Bankruptcy Court entered an emergency order approving an asset purchase agreement (the "Barclays Agreement") among the Lehman Chapter 11 Debtors, LBI, and Barclays Capital, Inc. ("Barclays"). Under the Barclays Agreement, Barclays acquired all of LBI's customer accounts.

With the Trustee's authorization and consent, the NSCC continued processing pre-Filing Date transfer requests directed to LBI through the morning of Monday, September 22, 2008. (General Ore Appendix at 00168 ¶ 30.) Later that day, the Trustee entered into an agreement with DTCC and Barclays, under which the NSCC was instructed to "close out" pending transactions involving LBI accounts in the same manner as it "close[d] out" positions of participants/members for whom it ceased to act. (General Ore Appendix at 00168.) The NSCC reversed "certain ACATS transfers for LBI customer accounts that had taken place on September 19, 2008 and all ACATS transfers for September 22, 2008," which presumably included Claimants' Account Transfer Requests. (General Ore Appendix at 00169 ¶ 31.)

On Tuesday, September 23, 2008, the NSCC issued an "Important Notice" (the "September 23 Notice") to its participants—including the New Brokers—informing them that it would "work[ ] with the SIPC Trustee" to "facilitate the movement of customer accounts" that were subject to transfer requests with settlement dates of September 19, 2008 through September 23, 2008. (General Ore Appendix at 00168 ¶ 33.) Just a day later, the NSCC reversed course in a second "Important Notice," (the "September 24 Notice") explaining that at the request of the Trustee and Barclays, it would not adhere to the procedures set forth in the September 23 Notice. Instead, the September 24 Notice merely stated that the NSCC would issue another notice soon explaining how the remaining account transfer requests—including those of Claimants—would be processed. (General Ore Appendix at 00170 ¶ 34.)

On Thursday, September 25, 2008, the NSCC issued a third "Important Notice" noting that under newly issued instructions from the Trustee and Barclays, none of the outstanding account transfer requests involving LBI brokerage accounts would be honored. (General Ore Appendix at 00170 ¶ 35.) The NSCC thus repudiated the Account Transfer Requests, leaving Claimants unable to access their securities until their accounts were transferred to Barclays on September 29, 2008 in accord with the terms of the Barclays Agreement.

II. Procedural History

    a. SIPA Proceeding

In June 2009, Claimants filed proofs of claims seeking the lost value of their securities resulting from the repudiation of their Account Transfer Requests. (General Ore Appendix at 00009–00023; Neu Appendix at 0002.) In November 2009, the Trustee filed a motion seeking Bankruptcy Court approval of his decision to transfer LBI's brokerage accounts in bulk to Barclays (the "Customer Account Motion"). (General Ore Appendix at 00024–56.) Claimants were not formally served with the Customer Account Motion, but the Trustee filed it on the Master Service List—docketed on the Bankruptcy Court's ECF system—and made it publicly available on its website. (General Ore Appendix at 00364.) In December 2009, without opposition from Claimants, the Bankruptcy Court granted the Trustee's Customer Account Motion. (General Ore Appendix at 00073–80.)

In September 2013, the Bankruptcy Court entered an order setting forth the procedures to file and adjudicate objections to claims asserted against LBI's general estate. (General Ore Appendix at 00081–00115.) In August 2014, the Trustee filed its 260th Claim Objection to Claimants' proofs of claim. (General Ore Appendix at 00116–156.) In February

5

2015, after the parties completed their briefing on the 260th Claim Objection, the Bankruptcy Court conducted a sufficiency hearing.

        b. Bankruptcy Court's Order

In April 2017, the Bankruptcy Court convened a telephone conference and issued an oral ruling, sustaining the 260th Claim Objection and holding that Claimants' Account Transfer Request claims against LBI's estate were disallowed and expunged. (General Ore Appendix at 00314–00320.) In May 2017, the Bankruptcy Court entered a formal order that incorporated its oral ruling and disallowed the Account Transfer Request claims.[2] (General Ore Appendix at 00321–00363.)

The Bankruptcy Court characterized the claims at issue as "general unsecured claims against the LBI estate for market losses that the securities in such accounts allegedly suffered prior to their ultimate transfer to another brokerage firm." (General Ore Appendix at 00368–00474 ("Bankruptcy Court Order"), at 7:12–16.) The Bankruptcy Court substantiated disallowance of the claims on a number of grounds. First, the court held that the Account Transfer Request claims would directly contravene the "governing statutory scheme set forth in Section 78fff of SIPA, which grants authority to the Trustee to transfer customer accounts to a solvent broker-dealer in his discretion and without customer consent, consistent with the purposes of SIPA." (Bankruptcy Court Order at 18:10–15.)

Second, although LBI owed Claimants a duty under the UCC to process their account transfer requests with due care, the Bankruptcy Court found that such duty only "applie[d] pre-insolvency and that, as of the Filing Date, [such duty] was superseded by the obligations [of the Trustee] under SIPA." (Bankruptcy Court Order at 19:23–25.) Where the

---

[2]     The Bankruptcy Court's May 2017 order was subsequently amended to reference the fact that Claimants were not formally served with the Customer Account Motion. (General Ore Appendix at 00366.)

6

debtor broker-dealer is in liquidation, the Bankruptcy Court recognized that "the Trustee's compliance with his duties under SIPA to dispose of customer property satisfies <u>any obligation LBI may have had</u> under" the UCC. (Bankruptcy Court Order at 20:23–25; 21:1–3 (emphasis added).) According to the Bankruptcy Court, federal law (<u>i.e.</u>, SIPA) "governs whether and how securities in the estate of a failed broker-dealer are returned to customers[,] and its account transfer provisions control, not the U.C.C.," thereby extinguishing any pre-insolvency claims relating to this obligation against LBI. (Bankruptcy Court Order at 23:3–6.) The Bankruptcy Court reasoned that here, because Claimants "received their full Filing Date net equity" under SIPA, they were "not entitled to additional amounts pursuant to the U.C.C." (Bankruptcy Court Order at 23:16–19.)

Finally, the Bankruptcy Court rejected Claimants' position that notwithstanding the duties codified under SIPA and the UCC, LBI owed—and breached—common law duties to its customers. Seizing on a comment in Section 8–503 of the UCC, the Bankruptcy Court held that when a securities intermediary like LBI "commences insolvency proceedings and can no longer perform in accordance with [the UCC], the applicable insolvency law[] will determine how the intermediary's assets will be distributed." (Bankruptcy Court Order at 27:9–13.) And while "entitlement holders of a securities intermediary [i.e., Claimants] have a property interest in the financial assets held by the intermediary," the court found that the "incidents of this property are established by the <u>rules of Article 8</u>, not by common law property concepts." (Bankruptcy Court Order at 25:21–23 (citing UCC § 8–503 cmt. 2).) Thus, even if LBI had common law and UCC-based duties to dispose of Claimants' financial assets in a timely fashion, the Bankruptcy Court found that any such duty was governed by SIPA once the insolvency proceeding was commenced, relieving the brokerage firm of both "a duty to the Claimants

7

pursuant to the common law [or] pursuant to the U.C.C. with respect to the requested account transfers." (Bankruptcy Court Order at 27:15–22.)

## DISCUSSION

I. Standard

District courts are vested with appellate jurisdiction over final judgments, orders, and decrees of bankruptcy courts. 28 U.S.C. § 158(a); see also Fed. R. Bankr. P. 8013. On appeal, the district court reviews a bankruptcy court's findings of fact for clear error, and any conclusions of law, or mixed questions of law and fact, de novo. See Babitt v. Vebeliunas, 332 F.3d 85, 90 (2d Cir. 2003); In re Adelphia Commc'ns Corp., 367 B.R. 84, 90–91 (Bankr. S.D.N.Y. 2007). The parties agree that the Bankruptcy Court's decision disallowing the claims is a conclusion of law subject to a de novo standard of review. (Appellants General Ore Int'l Corp. Ltd., et al., Brief, No. 17cv3762, ECF No. 20 ("General Ore Br."), at 12; Appellant Amy P. Neu Brief, No. 17cv3785, ECF No. 12 ("Neu Br."), at 6; Appellee James W. Giddens Brief, No. 17cv3785, ECF No. 18 ("Trustee Br."), at 6.)

II. Analysis

The principal issue on appeal is whether Claimants may assert claims against LBI's estate for market losses arising from the failure to execute the Account Transfer Requests before the Filing Date even though the Trustee subsequently transferred their accounts to another solvent broker. Claimants contend that their Account Transfer Requests—which were filed before LBI initiated the SIPA Proceeding—represent general, unsecured claims that may validly be asserted against LBI's estate.

Claimants do not dispute that the Trustee's decision to reverse the then-pending Account Transfer Requests was valid. Indeed, they acknowledge that upon commencement of

8

the SIPA Proceeding, the Trustee was empowered, in his discretion, to reverse Account Transfer Requests and re-route Claimants' accounts elsewhere. See In re Adler, Coleman Clearing Corp., 1998 WL 551972, at *11 (Bankr. S.D.N.Y. Aug. 24, 1998) ("The trustee has wide discretion in determining when to transfer all or any portion of a customer's account."). Rather, Claimants take issue with what LBI failed to do, arguing that if LBI honored the Account Transfer Requests before initiating the SIPA Proceeding, they would have received and sold their securities well in advance of the date the Trustee transferred their accounts to Barclays. If that happened, Claimants argue, they would have realized more value for their securities than what they were ultimately forced to accept. That the Trustee ultimately transferred the corpus of their accounts to Barclays should not, Claimants maintain, strip them of general unsecured claims against LBI. (General Ore Br. at 27.)

### A. Sufficiency of the Claims Alleging LBI's Breach

As an initial matter, it is doubtful that LBI breached its duty to execute the Account Transfer Requests. Claimants acknowledge that LBI confirmed its "receipt of the account transfers submitted by the New Brokers on Claimants' behalves," and "correspondingly provided formal notice through the ACATS Service that the entire contents of Claimants' brokerage accounts at LBI were slated for transfer and delivery" to the New Brokers. (General Ore Br. at 14–15.) LBI received and acknowledged the Account Transfer Requests on September 18, 2008. (General Ore Appendix at 00333.)

As a broker-dealer, LBI owed its accountholders certain duties under the UCC. Relevant here was LBI's obligation to "change [Claimants'] position into any other form of holding for which [they were] eligible or to transfer [their] position to an account at another" broker-dealer. UCC § 8–508. "[I]f the substance of [the] duty imposed upon [LBI]" under

9

Section 8–508, among others, is "the subject of other statute, regulation, or rule, compliance with that statute, regulation, or rule satisfies the duty."[3] UCC § 8–509. Under the applicable FINRA rules governing broker-dealer activity, LBI had—after "validat[ing] the transfer instruction" from the New Brokers—three days to transfer Claimants' accounts. See FINRA Manual Rule 11870(b)(1) & (e); see also Bankruptcy Court Order at 9:24–10:2. Unfortunately for Claimants, on September 19, 2008—just a day after LBI confirmed receipt of the Account Transfer Requests—SIPC commenced the SIPA Proceeding.

By all indications—with nothing asserted to the contrary—LBI was in the process of executing the Account Transfer Requests in a commercially reasonable manner when the SIPA Proceeding interdicted the process. Claimants' cause of action is predicated on the simple fact that their accounts were never transferred before the Filing Date. But because the commencement of the SIPA Proceeding intervened during the three-day period in which LBI was required to fulfill the Account Transfer Requests, there is nothing to suggest that LBI had breached its duty of care to Claimants under UCC § 8–508.

B. SIPA's Effect on LBI's Pre-Liquidation Duty

More importantly, however, as of the Filing Date, the Trustee assumed LBI's duty to honor the Account Transfer Request. "Under SIPA, the [T]rustee's role is to promptly discharge . . . all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash." In re Adler Coleman Clearing Corp., 195 B.R. 266, 274 (Bankr. S.D.N.Y. 1996) (citing 15 U.S.C. § 78fff–2(b)) (emphasis added); see also 15 U.S.C. § 78fff–1(b)(1) (Trustee's duty is to deliver securities to customers to the maximum extent practicable to satisfy customer claims for securities of the same class and series of an issuer); In re Bernard L.

---

[3] As noted later in this Opinion & Order, this rule also applies to the actions taken by the Trustee in conformance with his duties prescribed under SIPA.

10

Madoff Inv. Sec. LLC, 654 F.3d 229, 240 (2d Cir. 2011) ("SIPA is intended to expedite the return of customer property.") (emphasis added). "In other words, the Trustee [had to] promptly deliver customer name securities to [LBI's] customers as they [were] entitled to receive them and to distribute customer property." Adler Coleman Clearing Corp., 195 B.R. at 274. In taking over LBI—by then an insolvent entity rendered powerless over its affairs—the "Trustee step[ped] into [LBI's] shoes . . . for purposes of bringing property into the bankruptcy estate." Picard v. JPMorgan Chase & Co., 460 B.R. 84, 91 (Bankr. S.D.N.Y. 2011).

The Trustee did exactly what he was authorized to do. Though the Account Transfer Requests were pending as of the Filing Date, the Trustee picked up where LBI had left off and made the decision to "sell or transfer to [Barclays], another member of SIPC, without the consent of any customer, all or part of the account of a customer." 15 U.S.C. § 78fff–2(f) (emphasis added). While the Trustee's bulk transfer of customer accounts departed from the original plan to send Claimants' accounts to their New Brokers, SIPA expressly authorizes such actions in exigent circumstances like those surrounding LBI's collapse.

Claimants insist on a clear delineation between the Trustee and LBI's duties, arguing that no matter what the Trustee did in liquidation, LBI breached its pre-insolvency fiduciary duties when it repudiated the Transfer Account Requests and failed to deliver their accounts to the New Brokers. (General Ore Br. at 39, 41.) But this argument ignores the Trustee's outsize role vis-à-vis the outstanding obligations pertaining to customer property at the time of insolvency.

The Trustee's principal statutory duty was functionally the same as LBI's fiduciary duty. By operation of SIPA, the Trustee's duty to return customer property coalesced with LBI's pre-insolvency duty to transfer its customers' accounts. While the Trustee and LBI

11

contemplated different methods to discharge their duties—the former effecting a bulk transfer to Barclays and the latter transferring accounts to the New Brokers in three days—the task at hand was nevertheless the same: returning customer property from the debtor broker-dealer's possession to the customer.  Though Claimants attempt to impose a line between a pre- and post-insolvency duty, SIPA is designed to empower a Trustee to finish what a failed broker-dealer could not.

To illustrate their argument by analogy, Claimants posit a hypothetical scenario in which a Chapter 7 debtor agrees to sell his car for $10,000 to a neighbor.  The neighbor tenders payment to the debtor, but before surrendering possession and title to the car, the debtor files for bankruptcy.  During the bankruptcy, the Chapter 7 trustee in its discretion sells the car to another buyer and uses the proceeds (in addition to whatever remains of the $10,000) to augment the estate for the benefit of all creditors.  Although the bankruptcy prevented the transfer of the car, Claimants argue that it does not foreclose the buyer from asserting an unsecured claim against the debtor's estate for damages.  (General Ore Br. at 44.)  Similarly, Claimants say that while the Trustee here was authorized to reverse their Account Transfer Requests and re-direct their accounts to Barclays, they nonetheless may assert an unsecured claim against LBI's estate for market losses arising from LBI's failure to effect the account transfers before the SIPA Proceeding.  (General Ore Br. at 44.)

Claimants' analogy is inapposite for several reasons.  First, while there was an actual breach of contract in the Chapter 7 scenario, there was no such breach here.  Second, even if there was some breach—or an unmatured claim for breach—the Trustee here remedied that by performing the outstanding obligation. In the Chapter 7 case, the contract was repudiated in favor of augmenting the debtor's estate in other ways.  Third, the duties shared between the

12

debtors and trustees in a Chapter 7 proceeding versus a SIPA proceeding are fundamentally different.[4] As explained above, the Trustee's principal duty under SIPA overlapped with LBI's pre-insolvency duty to transfer Claimants' accounts. In the hypothetical scenario, however, the Chapter 7 trustee's duty to augment the debtor's estate for the collective benefit of creditors is meaningfully different from the debtor's pre-insolvency contractual duty to transfer the car's title to his neighbor. Put another way, SIPA requires the Trustee to discharge the debtor's pre-insolvency duty with respect to customer accounts, even if a Chapter 7 trustee is not obligated to honor any pre-insolvency contract. The duty to transfer customer accounts is distinctively within the Trustee's purview, while honoring a contract for the sale of a car is a matter of discretion for the Chapter 7 trustee.

        To underscore this point, it is helpful to contrast the duty to return customer property with another duty giving rise to a general estate claim. For example, a broker-dealer's failure to execute a trade order prior to liquidating is considered a "general, unsecured breach of contract claim[]." Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc., 229 B.R. 273, 279–80 (Bankr. S.D.N.Y. 1999); In re Oberweis Sec. Inc., 135 B.R. 842, 846 (Bankr. N.D. Ill. 1991); see also In re Bell & Beckwith, 124 B.R. 35, 36 (Bankr. N.D. Ohio 1990) (fraud arising from trades made on the basis of false inside information). This duty does not overlap with the Trustee's duties in a SIPA proceeding because the Trustee's role is "not that of a substitute broker." See Adler Coleman Clearing Corp., 195 B.R. at 274 ("SIPA [does] not require the [T]rustee to do anything other than to liquidate the securities and cash available to the debtor with the protection of all customers in view."). "Once the Trustee [is] appointed, his only authority is to liquidate the business." In re MF Global Inc., 515 B.R. 434, 439 (Bankr. S.D.N.Y. 2014). Because the

---

[4]     As the Trustee's counsel remarked at oral argument, it is "like comparing not apples to oranges, [but] apples and penguins." (H'rg Tr. at 22:12–13.)

Trustee is not required to perform a sell order placed before an insolvency, the debtor remains on the hook for that unperformed obligation. By contrast, the Trustee relieves a debtor of its pre-insolvency failure to transfer customer accounts.

Further, permitting these types of claims could result in disastrous consequences of the kind SIPA was created to avoid. In particular, customer account transfer requests that are submitted—yet unperformed—in the period straddling the commencement of a SIPA proceeding find themselves in no-man's land. If LBI in this instance had failed to effect the Account Transfer Requests within FINRA's three-day period before commencing the SIPA Proceeding, Claimants would likely have had a breach of duty claim against the estate. (See General Ore Br. at 61.). But here, the SIPA Proceeding began during the ambiguous straddle period preventing LBI—and by extension, the NSCC—from transferring the accounts at issue to the New Brokers.

Permitting these types of market loss claims, especially where the Trustee ultimately returns the contents of customer accounts, would encourage customers in future proceedings to commence protracted litigation and congest an otherwise efficient administration of assets under SIPA. It would also encourage a mad dash of customers seeking to effect account transfers based merely on their belief that liquidation might be imminent. Such a "run on the bank" could exacerbate—rather than ameliorate—the chaos, causing a stampede of investors seeking to pull their accounts, all but assuring a liquidation proceeding and leaving a surfeit of account transfer requests suspended and unperformed. That, in turn, would only hinder the orderly and efficient transfer of accounts to solvent brokers, and undermine the streamlined process for the Trustee to return customer property as promptly as possible.

Having concluded that the Trustee's bulk transfer of Claimants' account satisfied LBI's pre-insolvency duty to honor the Account Transfer Requests, Claimants are foreclosed

14

from seeking the recovery of market losses resulting from delay in transferring their accounts. SIPA "does not protect customers against market loss accruing during the period between the filing date and the date on which a claim is determined or paid, regardless of which way the market has moved." 1 Collier on Bankruptcy ¶ 12.14 (16th ed. 2015); In re MF Global Inc., 2013 WL 5232578, at *3 (Bankr. S.D.N.Y. Sept. 17, 2013) ("SIPA does not protect customers against the diminution in value of the securities.").

C. SIPA's Interaction with the UCC

Claimants rely on UCC § 8–508 to assert that even at the outset of the SIPA Proceeding, LBI owed an enforceable obligation to "act at the direction of an entitlement holder . . . to cause the financial asset to be transferred to a securities account of the entitlement holder with another securities intermediary." (General Ore Br. at 39.) Because LBI's duty to "perform this obligation may have been contingent or otherwise remained less than fully matured," Claimants should have been permitted to assert a claim against LBI's general estate. (General Ore Br. at 40 (citing 11 U.S.C. § 502(b)(1)).)

By operation of SIPA, LBI was relieved of its obligation to complete the Account Transfer Requests. And the Trustee stepped into the void to satisfy the outstanding obligation. Indeed, the UCC expressly contemplates this situation: "[i]f the intermediary fails and its affairs are being administered in an insolvency proceeding, the applicable insolvency law governs how the various parties having claims against the firm are treated." UCC § 8–503 cmt. 1. Moreover, although the duties set forth in UCC §§ 8–505 through 8–508 permit a customer to enforce its property interest against the broker-dealer, if the "intermediary [i.e., the broker-dealer] is in insolvency proceedings and can no longer perform in accordance with ordinary Part 5 rules [i.e., the UCC duties], the applicable insolvency law will determine how the intermediary's assets are

15

to be distributed." UCC 8–503 cmt. 2; see also SEC v. Credit Bancorp, Ltd., 2000 WL 1752979, at *23–24 (S.D.N.Y. Nov. 29, 2000) (citing comment 2 to UCC § 8–503) aff'd, 290 F.3d 80 (2d Cir. 2002). When LBI became insolvent and lost the ability to complete the Account Transfer Requests, SIPA authorized the Trustee to take over and execute that task. And that outcome makes sense in view of UCC § 8-509, which provides that "[i]f the substance of a duty imposed upon a securities intermediary [here, LBI] by . . . 8–508 is the subject of other statute [here, SIPA], regulation, or rule, compliance with that statute, regulation, or rule satisfies the duty." With the Trustee stepping into LBI's shoes, the Trustee performed the duty at issue in § 8–508, the substance of which, as discussed above, is the same as the Trustee's duty under SIPA.

Claimants counter that the comments to UCC § 8-503 do not undermine their position since they address only the distribution of assets in a SIPA proceeding, not the allowance of claims against the debtor's estate. But that interpretation is inconsistent with SIPA's purposes, and in particular, the Trustee's duties with regard to disposing customer property. Indeed, when the insolvent broker-dealer can no longer perform its duties, SIPA displaces the UCC and defers to the Trustee's decisions in satisfying the unperformed duties of the broker-dealer.

Moreover, Claimants borrow the allowance concept from Section 502(b) of the Bankruptcy Code to bolster their position that an unmatured, contingent claim like theirs is presumptively allowable against the debtor's estate. See In re Bernard L. Madoff Inv. Sec. LLC, 515 B.R. 117, 153 (Bankr. S.D.N.Y. 2014) (defendants' "conduct warrants the disallowance of their claims under SIPA which is incorporated through [Bankruptcy Code] § 502(b)(1)"); Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 513 B.R. 437, 442–43 (S.D.N.Y. 2014) ("[T]o the extent that SIPA otherwise fails to detail the mechanics of the claims process, courts

16

have looked to section 502 of the Bankruptcy Code for guidance."). While that is true, a SIPA liquidation proceeding may be conducted "as though it were being conducted" under the Bankruptcy Code only "[t]o the extent consistent with the provisions of" SIPA. See In re Bernard L. Madoff Inv. Sec. LLC, 721 F.3d 54, 71 (2d Cir. 2013) (citing 15 U.S.C. § 78fff(b)). One of the glaring differences between the two statutory schemes is that a "SIPA trustee has some powers not conferred on a trustee under Title 11. Most notably, SIPA creates a fund of customer property that is separate from the debtor estate and that has priority over other creditors' claims, and authorizes the trustee to ratably distribute those funds on customers' net equity." Bernard L. Madoff Inv. Sec. LLC, 721 F.3d at 71. To "allow" unmatured, contingent claims predicated on the non-performance on an obligation that the Trustee has already performed would abrade the fundamental purpose of SIPA and the Trustee's primary duty. 15 U.S.C. § 78fff–2(f).

In view of SIPA's displacing effect on the UCC, this Court concludes that the Bankruptcy Court properly disallowed the Account Transfer Request Claims under 11 U.S.C. § 502(b)(1). That section specifically permits disallowance where a "claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1) (emphasis added). Here, the Trustee's actions pursuant to SIPA rendered Claimants' Account Transfer Requests Claims unenforceable against LBI.

D. SIPA's Effect on Common Law Duties

Claimants also assert that the Bankruptcy Court improperly held that their common law rights were "immediately pre-empted and extinguished by SIPA." (General Ore Br. at 59.) But just as SIPA supplanted the UCC, the UCC displaced LBI's common law duties:

17

"[a]n entitlement holder's property interest with respect to a particular financial asset . . . may be enforced against the securities intermediary only by exercise of the entitlement holder's rights under Sections 8–505 through 8–508." UCC § 8–503(c). Moreover, "the incidents of [the] property interest" of an entitlement holder referenced in the UCC provisions are "established by the rules of Article 8 [of the UCC], not by common law property concepts." UCC § 8–503 cmt. 2. Thus, where the "U.C.C. states specifically that an entitlement holder's property rights over assets held by its securities intermediary are defined by the U.C.C. and not by the common law, and specific U.C.C. provisions are identified as the 'only' mechanism for enforcing those rights, then the common law has been supplanted." Credit Bancorp, 2000 WL 1752979, at *24.

    E.  Procedural Deficiencies in the Proceeding Below

Claimants contend that the Bankruptcy Court erroneously disallowed their Account Transfer Request claims on the basis that they had failed to oppose the Customer Account Motion. (General Ore Br. at 47.) While the parties quibble about whether Claimants had sufficient notice of the Customer Account Motion, Claimants note that even if the motion had been properly served, "there would have been no reason . . . to oppose this Motion." (General Ore Br. at 49.) Based on their principal contention that LBI should be held accountable for repudiating the pre-liquidation Account Transfer Requests, Claimants' failure to object to the Customer Account Motion has no bearing on whether they waived the opportunity to file a claim against the general estate.

Moreover, the Bankruptcy Court's order merely references that Claimants were "provided sufficient notice and an opportunity to be heard on the Customer Account motion and did not object." (Bankruptcy Court Order at 18:3–5.) But that is not the principal basis on which the Bankruptcy Court disallowed their claims. The Bankruptcy Court made clear that permitting

18

general creditor claims premised on a failure to transfer customer accounts would undermine the remedial purposes of SIPA and cut against Congress's directive that application of the Bankruptcy Code—including the allowance and disallowance of claims—be consistent with SIPA's provisions. (Bankruptcy Court Order at 15:23–17:8.) Claimants' failure to oppose the Customer Account Motion—whether properly served or noticed—does not change that conclusion.

F. Constitutional Infirmities in SIPA's Statutory Scheme

Finally, Claimants question the constitutionality of the Bankruptcy Court's order on the ground that its construction of the UCC intrudes on Congress's right to establish a uniform system of bankruptcy law. (General Ore Br. at 56–57.) More specifically, by finding that the SIPA Proceeding extinguished LBI's pre-liquidation UCC obligations, Claimants argue that the Bankruptcy Court's order contravened the principle that state statutes like the UCC must remain bankruptcy neutral. See In re Ross, 18 B.R. 364, 366 (N.D.N.Y. 1982), aff'd sub nom., Regan v. Ross, 691 F.2d 81 (2d Cir. 1982). According to Claimants, the effect of the Bankruptcy Court's interpretation is to deprive creditors of their right to pursue general unsecured claims against the debtor's estate under Bankruptcy Code Section 502(b).

But the Bankruptcy Court's reading of SIPA and the UCC do no such thing. First, the Bankruptcy Code's provisions are only applicable to the extent they are consistent with SIPA's provisions. 15 U.S.C. § 78fff–1(b). As a matter of statutory interpretation, the Bankruptcy Court held that allowing the claims at issue here would be inconsistent with SIPA's provisions. Second, SIPA was created as a comprehensive scheme to regulate the liquidation of insolvent broker-dealers and empowers the Trustee to step into the shoes of the failed broker-dealer to, among other things, return customer property. By arguing that the Bankruptcy Court's

19

interpretation of the UCC removes certain rights in the event of a bankruptcy or insolvency, Claimants ignore entirely the unique position that SIPA occupies in the context of broker-dealer insolvencies. Thus, while the Bankruptcy Code provides for the allowance of general claims, it does so in a SIPA proceeding only to the extent that it does not undermine SIPA's remedial purposes and the Trustee's statutorily prescribed duties. The Bankruptcy Court's conclusion that SIPA's provisions displace the specific duty in UCC § 8-508 does not interfere with Congress's authority to establish a uniform system of bankruptcy law.

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court's order is affirmed. The Clerk of Court is directed to close Case Nos. 17cv3762 and 17cv3785.

Dated: March 22, 2018
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.